IN THE CHANCERY COURT FOR SEVIER COUNTY TENNESSEE

| | |
|---|---|
| KARS, LLC, ROBERT HENDERSON DEVELOPMENT 1, LLC, ROCKY TOP FORD LINCOLN, LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>RONALD W. OGLE, BETTY M. OGLE, WHALEY PROPERTIES INC., LD&S TN, LLC, DANIEL L. WEBB, LYNN T. WEBB,<br><br>Defendants. | Case No. 24-5-164 |

CHANCERY COURT
FILED
HOUR:__________M.
MAY 23 2024
Carolyn S. McMahan
CLERK & MASTER
SEVIER COUNTY, TN

## COMPLAINT

KARS, LLC ("KARS"), Robert Henderson Development 1, LLC ("RH1") and Rocky Top Ford Lincoln, LLC ("Rocky Top") (collectively, "Plaintiffs"), by and through their undersigned counsel, for their Complaint against Ronald W. Ogle, Betty M. Ogle, Lynn T. Webb, Daniel L. Webb, Whaley Properties, Inc. ("Whaley") and LD&S TN, LLC ("LD&S") (collectively "Defendants"), respectfully allege upon information and belief as follows:

### PRELIMINARY STATEMENT

1. This action arises from Defendants' predatory and unfair scheme to obstruct Plaintiffs' development of a commercial business complex on three parcels of property located at 750 Dolly Parton Parkway, Sevierville, TN 37862 (the "DP Property"), with the intent to undermine Plaintiffs' business and unlawfully seize property, profits and business prospects for their own unlawful gain. Defendants' actions make clear that they do not think the rules apply to them, and that they can bully their way through the City of Sevierville, trampling Plaintiffs and



EXHIBIT 4 tabbies (Answer to Amended Complaint)

anyone else that stands in their way. Through the Webbs and Ogles' bad-faith tactics, fraudulent actions and unfair business practices, Plaintiffs' business plans were effectively destroyed.

2. Plaintiffs, which share common owners, identified the DP Property as an ideal location for the construction of a high-end business complex that was to include an 8,000 square foot liquor store, a state-of-the-art 26,000 square foot, multi-level, air-conditioned self-storage business, two restaurants comprising nearly 17,000 square feet, a retail space of 1,800 square feet and a 2,540 square foot Starbucks, along with hundreds of spaces of parking for the business. As part of their business plan, KARS and RH1 acquired the rights to the DP Property from Rocky Top, which had entered into ground leases with Whaley ("Whaley Agreement") and LD&S ("LD&S Agreement"). The Whaley Agreement and the LD&S Agreement contained an option that allowed Rocky Top to purchase the DP Property from Whaley and LD&S.

3. But Defendants had other plans. Ron and Betty Ogle also recognized the value in the DP Property, and schemed to destroy Plaintiffs' business opportunity to appropriate it for themselves. Indeed, days after Plaintiffs were awarded a certificate of compliance from the City of Sevierville to operate a liquor store on the property, the Ogles launched a campaign to prevent Plaintiffs from benefitting from their license and stymie their development project.

4. The Ogles hatched their malicious plot by orchestrating a false public relations campaign through the local press, aimed at pressuring the City of Sevierville into revoking Plaintiffs' liquor license. The Ogles, through their attorney Scott Hall, falsely asserted that the City of Sevierville had violated its own distance requirement by giving Plaintiffs a certificate of compliance for a liquor store on the DP Property, incorrectly claiming it was less than 1,000 feet from a church. But city officials disagreed and confirmed that the certificate of compliance adhered to the ordinance as it pertained to Plaintiffs' DP Property location.

5. With their legal challenge foreclosed, the Ogles took matters into their own hands and conspired to interfere with Plaintiffs' contract for the DP Property by plotting with Lynn Webb, the Vice Chairman of Board of Directors of Citizens National Bank ("CNB"), and the President of Whaley, and his son Daniel Webb, the Secretary of the Board of CNB and the President of LD&S, to deprive Plaintiffs of the DP Property.

6. Whaley and LD&S were contractually bound to sell their respective parcels of the DP Property to Rocky Top, which leased the land and had a contractual option to purchase it for its appraised value. Rocky Top exercised its option, and the parties spent weeks conducting due diligence, performing Phase I and Phase II environmental studies (at significant cost to Plaintiffs), and exchanging draft Purchase and Sale Agreements ("PSAs").

7. But when Plaintiffs discovered environmental issues at the site, which Whaley and LD&S failed to disclose to Plaintiffs and the relevant Tennessee authorities, the Webbs refused to negotiate or bear any additional cost of cleanup or accept a lower appraised value. Instead, they schemed to avoid the costs of the necessary cleanup and extract extra profit from the sale by conspiring to sell the land to the Ogles, who agreed to pay a premium above the appraised value and to indemnify Whaley and LD&S for the environmental issues at the site.

8. To carry out their scheme, the Webbs temporized for weeks with Plaintiffs' attorney—feigning that they were negotiating in good faith—and delayed the closing as long as they could to run out the clock on the option period, including by asking for the appraisal date to be pushed back. The Webbs waited until the initial April 1, 2024 closing date for the purchase option to pass (which the parties had agreed to extended to May 1, 2024), and on April 2, 2024, pretextually terminated the agreement, inexplicably claiming that they "desire[d] to terminate any further discussions regarding the Lessee's desire to purchase the premises."

9. The Webbs knew they were breaching their agreements in bad faith, as they had already agreed to extend the closing date to May 1, but Lynn Webb wanted to teach Plaintiffs a lesson for what he described as Plaintiffs trying to "*Jew around*" during the negotiations. The Webbs saw the Ogles as the perfect conspirators to facilitate the scheme because the Ogles had already publicly stated their intent to stop the project at all costs. The Webbs knew that Whaley and LD&S' breach of their contracts with Rocky Top would impact the business of KARS and RH1, but that was the objective of their scheme. Indeed, after Whaley and LD&S breached the Whaley Agreement and the LD&S Agreement with Rocky Top, Lynn Webb called one of the members of KARS and RH1 to explain how their termination of the agreements "went down."

10. Defendants consummated their plan by arranging for Whaley and LD&S to sell the land out from under Plaintiffs to the Ogles, who recorded the sales days later, on April 12, 2024. Thus, the Webbs avoided the costs of the environmental cleanup Whaley and LD&S had neglected to address, extracted a premium to the appraised value of the land and extra profits for themselves, and taught Plaintiffs a lesson for trying to "Jew around."

11. The Ogles, for their part, benefitted by achieving their goal of stopping Plaintiffs business plans and usurping Plaintiffs' business opportunity for themselves, and wasted no time taking their victory lap. In a statement to the *Mountain Press*, the Ogles proudly boasted of their success, noting that they had been ready to take Plaintiffs to Court to prevent the construction of their business, but that such actions became "a moot point" when they bought the land.

12. Thus, through their conspiracy and bad-faith dealings, Defendants deprived Plaintiffs of their contractual rights and tortiously interfered with their business relations. Plaintiffs seek remedies for Defendants' misconduct, including recovery of damages for Defendants' wrongdoing.

## PARTIES

13. Plaintiff KARS, LLC is a Tennessee company, authorized to conduct business in the state of Tennessee.

14. Plaintiff Robert Henderson Development I, LLC is a Tennessee company, authorized to conduct business in the state of Tennessee.

15. Plaintiff Rocky Top is a Tennessee company, authorized to conduct business in the state of Tennessee.

16. Defendant Ron Ogle is a resident of Sevierville, Tennessee.

17. Defendant Betty Ogle is a resident of Sevierville, Tennessee.

18. Defendant Whaley is a Tennessee company, authorized to conduct business in the state of Tennessee.

19. Defendant LD&S is a Tennessee company, authorized to conduct business in the state of Tennessee.

20. Defendant Daniel Webb is a resident of Knoxville, Tennessee and the President of LD&S during the relevant time period. He is also the Secretary of the Board of CNB.

21. Defendant Lynn Webb is a resident of Knoxville, Tennessee and the President of Whaley during the relevant time period. He is also the Vice Chairman of Board of Directors of CNB.

## JURISDICTION AND VENUE

22. Jurisdiction is proper in this Honorable Court as the underlying issues in this case occurred in Sevier County, Tennessee, and Defendants are subject to personal jurisdiction in this judicial district.

23. This Honorable Court is the appropriate venue under Tenn. Code Ann. §20-4-101 as the county where the causes of action arose.

## FACTUAL ALLEGATIONS

### I. Plaintiffs' Plan to Develop and Operate the Business Complex

24. In or about the summer of 2023, Plaintiffs, local entrepreneurs from Sevier County, formed a partnership to develop and operate a large-scale commercial business complex on the DP Property to serve the Sevierville community (the "Project"), which was to bring jobs and economic growth to the region. These individuals identified the DP Property as a uniquely valuable site because of its ideal location off Dolly Parton Parkway, in the heart of Sevierville.

25. The DP Property consists of three tracts of land, which are located at 750 Dolly Parton Parkway, Sevierville, TN 37862. The "Whaley Parcel" is designated by the Sevier County Property Assessor as Tax Parcel 029.00 (Ctrl Map 049L, Group A) and Tax Parcel 011.00 (Ctrl Map 049L, Group A); the "LD&S Parcel" is designated by the Sevier County Property Assessor as Tax Parcel 001.00 (Ctrl Map 049M, Group D) and Tax Parcel 058.01 (Ctrl Map 049M, Group D); and the "Henderson Parcel" adjoins the Whaley Parcel to the east, and is bounded on the west by Robert Henderson Road.

26. The Project called for the construction, development and operation of an 8,000 square foot liquor store, a 26,000 square foot, multi-floor, air-conditioned self-storage business, two restaurants with indoor and outdoor seating, comprising nearly 17,000 square feet, a retail

space of 1,800 square feet and a 2,540 square foot Starbucks, along with hundreds of spaces of parking to accommodate for the robust business. Soon thereafter, RH1 was formed to construct and operate the Project's business complex.

27. The liquor store was a particularly valuable asset for Plaintiffs because the operation of a liquor store was a unique and limited opportunity. The City of Sevierville had, since its founding, been a partially dry municipality that did not allow for the retail sale of liquor and consumers were therefore forced to travel to Knoxville or Gatlinburg to find the closest liquor store. That changed in May 2023, when the voters of Sevierville approved a referendum for the establishment of liquor stores within the city.

28. Over the following months, Sevierville officials formalized rules surrounding liquor stores, known as "retail package stores," which resulted in Ordinance No. O-2023-015, an Ordinance to Amend Title 8 of the Sevierville Municipal Code by adding a new Chapter 3, "Retail Package Stores" ("Ordinance").[1]

29. The Ordinance was approved by the Board of Mayor and Aldermen of the city in October 2023. The city, however, authorized the approval of only five certificates of compliance to operate liquor stores, which were to be awarded via a lottery in each of five designated zones. The DP Property was located in Zone 3, which encompassed "SR 35 from west city limits to east city limits." Plaintiffs were selected as winners from among a pool of 25 applicants and were granted the only license to operate a liquor store within the entirety of Zone 3, providing them with an immensely valuable asset.

30. Within each zone, there were additional restrictions that severely restricted the available location of liquor stores. Ordinance Section 8-305 stated that liquor stores could only be

[1] https://seviervilletn.org/index.php/administration/2567-ordinance-o-2023-015-retail-package-stores/file.html

located in zoning districts zoned as Arterial Commercial and Tourist Commercial, and such stores could not be located within 1,000 feet of any other retail package store, or within 1,000 feet of any church property on which the primary congregational assembly facility is located, any school, or any public park or within 1,000 feet from any distillery. Moreover, Ordinance Section 8-305 required that a retail package store must be located on property with arterial street frontage and must be visible from that arterial street, and that no retail package store be located where the operation of a retail package store at the premises contemplated by an application would unreasonably interfere with public health, safety or morals.

31. Ordinance Section 8-306 required that all retail package stores be a permanent type of construction in a material and design approved by the Board of Mayor and Aldermen, that no retail package store be located in a manufactured or other movable or prefabricated type of building, stores have adequate nighttime illumination of the outside of the premises, and the minimum square footage of the retail package store be 4,500 square feet with at least 50% of the square footage consisting of a showroom. Moreover, "full, free, and unobstructed vision shall be afforded to and from the street to the interior of the retail package store by way of windows in the front and, to the extent practical, in the sides of the building containing the retail package store." Thus, the Ordinance severely limited the scope of viable locations to operate the liquor store.

32. In addition, Ordinance Section 8-315 required applicants for a certificate of compliance to file an application with the City Recorder and obtain approval of the location by the Board of Mayor and Aldermen, with the application to be approved at a public meeting. The issuance of certificates of compliance were to be awarded via a lottery.

33. Plaintiffs recognized the immense value in obtaining a license to operate a retail liquor store in a previously dry municipality. Indeed, after voters approved a referendum to allow

liquor stores in the previously dry McCreary County, Kentucky, liquors stores generated millions of dollars in sales.

34. They therefore formed KARS to apply for the certificate of compliance and enter the city lottery, and identified the DP Property as the optimal location for the business venture. The DP Property was unique in that in satisfied all of the Ordinance's numerous restrictions, was centrally located in the City of Sevierville, and was near various retail locations that Plaintiffs could draw customers from.

35. Plaintiffs hired attorneys and architects, and began their application process in earnest. As part of that process, Plaintiffs obtained a binding Letter of Intent ("LOI") dated December 27, 2023, between Rocky Top and KARS, in which Rocky Top agreed to grant KARS a leasehold estate in the Property upon the City of Sevierville approving KARS for a retail package store license.

36. The LOI expressly stated that Rocky Top had a Ground Lease Agreement with Whaley, dated and effective April 1, 2019, which, pursuant to Section 22, provided Rocky Top with an option to purchase a portion of the DP Property. The LOI contractually obligated Rocky Top to (1) exercise its purchase option and (2) enter into a commercial lease agreement with KARS to operate the retail package store at the DP Property if KARS were approved for a retail package store license. The LOI further provided that it was "binding on the parties," and committed Rocky Top to provide KARS with lease exclusivity during the period while KARS' retail package store application was pending. The LOI is attached as Exhibit 1.

37. On January 8, 2024, the Board of Mayor and Aldermen held a special called meeting to consider the lottery applicants, and KARS was selected as the winner for Zone 3.

## II. Rocky Top Exercises its Option to Purchase the Land

38. Consistent with its contractual commitment to KARS, Rocky Top exercised its purchase option on the Whaley Parcel, as well as its option, pursuant to an identical provision, to purchase the LD&S Parcel of the DP Property.

39. Rocky Top had entered two nearly identical ground leases on April 1, 2019, with Whaley and LD&S, which were controlled by Lynn and Daniel Webb, as presidents of the respective entities. The Whaley Agreement and LD&S Agreement provided for an initial term of five years, ending the day before the fifth anniversary of the Effective Date—March 31, 2024.

40. The Whaley Agreement and LD&S Agreement also contained identical provisions that provided Rocky Top the right to purchase the fee interest underlying the land. Section 22.1 stated:

> Provided that (i) the Term of this Lease has yet to expire and (ii) no state of facts then existed which constitute an event of default or which, with the passing of time or the giving of notice, would constitute an Event of Default, the Lessee shall have the right (at any time during the term of this Lease) to purchase the fee simple interest of the Lessor in the Leased Premises (the "Fee Interest") by tendering written notice to the Lessor of the Lessee's exercise of this right (the "Exercise Notice") and specifying the proposed closing date (the "Closing Date") on which the Lessee intends to close the purchase of the Fee Interest (the "Closing"), which Closing Date must occur after the determination of the Fee Interest Appraised Value. The Lessee's right to purchase the Fee Interest, pursuant to the terms and conditions of this Section 22, shall be referred to as the "Purchase Option."

41. Section 22.2, in turn, provided that the purchase price for the Fee Interest shall be the appraised value of the property as determined by an independent appraiser, who shall be selected by the Lessee and the Lessor through "a good faith effort." Section 22.2 further provided that "the fair market value as determined by the selected appraiser shall be final and binding."

42. On February 9, 2024, after KARS was selected for the lottery drawing for a Zone 3 certificate of compliance, Rocky Top sought to honor its contractual commitment to KARS and Rocky Top's counsel, Kacie McRee, wrote to Whaley and LD&S' counsel, Ryan Russell: "My client just made me aware that depending on the results of appraisal that is currently being conducted, he may be interested in purchasing both the Whaley parcel and the LDS parcel as part of this purchase option. This is different than what we conveyed in our notice letter last year, so I wanted to let you know as soon as possible so you could make your clients aware. Let me know if your clients are agreeable."

43. On February 12, Mr. Russell responded in the affirmative, noting: "*My client is agreeable to your client exercising the Purchase Option in the Ground Lease with Whaley Properties, Inc.*" Ms. McRee replied that day, saying: "Thanks Ryan. I'll prepare the official written notice and send it to you as soon as possible."

44. Over the following weeks, the parties' counsel negotiated the terms of the purchase and appraisal, and agreed on an auction company to conduct the required appraisal of the Whaley and LD&S Parcels. They also discussed the possibility of holding an equipment auction. Mr. Russell noted that his client was "open to conducting an auction of the equipment at the site," but that "any such auction should be conducted prior to closing the purchase of the Whaley Parcels."

45. On February 20, 2024, Mr. Russell and Ms. McRee had a call to discuss the details of the equipment auction. Ms. McRee wrote Mr. Russell on February 26 to follow up on their discussion; Mr. Russell did not respond. On February 28, Ms. McRee wrote again; Mr. Russell again did not respond. Ms. McRee again wrote on March 1, and Mr. Russell finally responded: "Sorry for the delay. I've been very covered up this week. I'm trying to schedule a meeting with my client."

46. By March 6, 2024, Mr. Russell still had not provided an update, prompting Ms. McRee to again write:

> Ryan, I called your office today and your assistant let me know you are in a seminar today. I am traveling for a portion of the day tomorrow, but am hoping we can find some time tomorrow to discuss the Whaley/LD&S purchases. In particular, (1) we need to know if your client is agreeable to adding the value of the equipment to the purchase price for the Whaley real estate and selling it together?; and (2) we need to know if both of your clients are agreeable to a May 1 closing date? Finally, my client got the results of the Phase I on the Whaley property back, and they are recommending a Phase II due to the in-ground lifts my client mentioned previously. The cost of the Phase II is $24,000. *My client doesn't want to commit to this cost until we know if your clients are good with the 2 items noted above.* The consultant wants to start on the Phase II on Friday, so we would like to find about #1 and #2 above as soon as possible in order to decide on the Phase II.

47. Mr. Russell responded that day by again temporizing: "I had a preliminary conversation with my client yesterday. He was going to discuss this with his family yesterday/today. I will try to discuss this with him again today. Can you email the Phase I to me so my client can get up to speed on that?"

48. Nevertheless, Whaley and LD&S thereafter agreed to a May 1 closing date for the purchase, which Mr. Russell communicated orally to Ms. McRee, and Rocky Top proceeded with a Phase II study in reliance on that representation.

49. On March 25, 2024, Mr. Russell circulated draft PSAs for Ms. McRee's review. The draft PSAs included a provision noting that "[t]he consummation of the transactions contemplated by this Agreement *(the 'Closing') shall be held . . . on May 1, 2024* or such earlier date as the Purchaser and the Seller mutually agree upon (the 'Closing Date')." On March 27, Mr. Russell and Ms. McRee spoke by phone to discuss the results of the Phase II study and how the

associated cleanup costs would be split. The next day, on March 28, Mr. Russell followed up and asked for a written estimate of the cleanup costs the parties discussed.

50. But Lynn and Daniel Webb did not want to pay any portion of the cleanup costs for the DP Property and were incensed that Plaintiffs even raised the issue of a cleanup. Rather than negotiating in good faith over how to remedy the environmental issues on the land, or risking a lower appraisal price from the discovery of the environmental issues, they instead ran out the clock on the closing date to teach Plaintiffs a lesson for "Jewing around." On April 2, 2024—the day after the initial Closing Date set forth in the LD&S Exercise Notice—Mr. Russell sent a purported termination letter ("Termination Letter"). In it, Whaley and LD&S asserted demonstrably false and bad-faith bases for terminating the Whaley and LD&S Agreements.

51. As to the Whaley Agreement, Mr. Russell wrote: "Pursuant to Section 2 of each Lease, the deadline for the Lessee to exercise the Option Term in each Lease was October 4, 2023. Accordingly, the Term of each Lease is now irrevocably expired. Pursuant to Section 22 of the Whaley Lease, the Purchase Option in the Whaley Lease must be exercised during the Term of said Lease. Therefore, the Purchase Option in the Whaley Lease is now expired."

52. Of course, Whaley and LD&S had already agreed to proceed with allowing Rocky Top to modify the contract to permit Rocky Top to exercise its option on the Whaley Parcel, and Rocky Top relied on those representations and expended considerable money continuing with its Phase II studies of the land. Indeed, Mr. Russell had expressly noted that Whaley and LD&S were "agreeable to your client exercising the Purchase Option on the Ground Lease with Whaley Properties, Inc.," extended the Closing Date for the transaction to May 1, and circulated a draft Purchase and Sale Agreement for the Whaley Parcel.

53. Whaley and LD&S asserted similar bad-faith justifications for terminating the LD&S Agreement. In the Termination Letter, Whaley and LD&S claimed that "[t]he Purchase Option set forth in Section 22 of the LD&S Lease was exercised by that certain letter dated June 7, 2023 from Kacie McRee on behalf of the Lessee (the 'LD&S Exercise Notice'). The Closing Date set forth in said LD&S Exercise Notice was April 1, 2024, which date has now passed with neither a Closing nor satisfaction of my client's conditions for an extension of said Closing Date. Therefore, my client takes the position that the Purchase Option in the LD&S Lease is now expired as well." But as Whaley and LD&S well know, they had agreed to extend the Closing Date until May 1, 2024 and circulated draft PSAs memorializing that understanding.

54. The Webbs' decision to terminate these agreements in bad faith was done with the intent to harm Plaintiffs and punish them for having the audacity of asking the Webbs to split the cleanup fee to remediate the environmental issues on the property, and they did so with Ron and Betty Ogle, who had been scheming for weeks to sabotage Plaintiffs' business objectives and were all too eager to assist.

## III. The Ogles Announce Their Plan to Stop Plaintiffs' Development to Take the Land for Themselves

55. Ron and Betty Ogle are business owners and, upon information and belief, some of the largest landowners in Sevier County, with public records indicating that the Ogles own over 190 properties.

56. The Ogles own property at the corner of Middle Creek Road and Dolly Parton Parkway, including the Shell gas station, which sells alcohol and tobacco products, and the Parkway Plaza office/retail complex, both of which are near the DP Property. And from the outset, the Ogles were determined to prevent Plaintiffs from developing their business complex and opening a liquor store that would draw alcohol sales away from the Ogles' Shell station.

57. In February 2024, days after Plaintiffs won the lottery for a liquor license for Zone 3, the Ogles launched a press campaign announcing their intent to stop Plaintiffs from proceeding with their business plans. *The Mountain Press* reported on February 15, 2024, that "Attorney Scott Hall sent the city a letter this week on behalf of the Ogles saying that the city had violated its own new distance requirement by giving a certificate of compliance for the property at 750 Dolly Parton Parkway, which is the former site of Rocky Top."[2] The Ogles' attorney claimed that "[i]f a certificate of compliance has been awarded for use of 750 Dolly Parton Parkway as a retail package store, then such would violate the 1,000 foot distance prohibition from a church."

58. But the City of Sevierville disagreed, and the city's spokesperson said officials there did not believe the distance requirement applied to property that is not owned by a church. The Public Information Officer for the City of Sevierville, Bob Stahlke, made clear that the city was "confident at this time that we have adhered to the ordinance as it pertains to the Dolly Parton Parkway location."

59. The City took no action on Ogle's demands and instead issued the certificate of compliance, the purpose of which is to attest to the Tennessee Alcoholic Beverage Commission that a particular applicant (including its location) for a retail package store license, among other things, "ha[s] secured a location for the business which complies with all restrictions of any local law, ordinance, or resolution, duly adopted by the local jurisdiction, as to the location of the business." Tenn. Code Ann. § 57-3-208.

60. By signing the certificate of compliance, the Board of Mayor and Alderman attested to the fact that "[t]he location stated in the certificate has been approved by the Board of Mayor

---

[2] https://www.themountainpress.com/news/certification-for-liquor-store-gets-challenge/article_06e5fecc-6026-5cf3-9dab-1e622485d764.html

and Aldermen as a suitable location for the operation of a retail package store." Ordinance 8-315(3)(b).

61. With their legal arguments rejected by the city, the Ogles took matters into their own hands and usurped the will of the voters and elected officials of the city by buying the land out from under Plaintiffs to prevent the liquor store and business complex from being built. Indeed, on April 12, 2024, just days after Whaley and LD&S sent the Termination Letter, Ron and Betty Ogle recorded General Warranty Deeds indicating that they purchased the Whaley and LD&S Properties.

62. The Ogles' purchase, which was accomplished in mere days—rather than the weeks Plaintiffs spent conducting diligence preparing the necessary paperwork—underscored the Ogles' desire to prevent Plaintiffs' business at all costs. Tellingly, the publicly filed General Warranty Deed contained a provision indicating that the Ogles purchased the land and took on all the environmental liability flowing from the contamination identified in the Phase II studies. The General Warranty Deed stated:

> Without limiting the foregoing, THE GRANTOR DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. ADDITIONALLY, THE GRANTOR DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES AS TO THE ABSENCE OR PRESENCE ON OR UNDER THE REAL PROPERTY OF HAZARDOUS SUBSTANCES AS DEFINED BY ANY ENVIRONMENTAL LAWS, INCLUDING WITHOUT. LIMITATION THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT ("CERCLA") OR SIMILAR FEDERAL AND STATE LEGISLATION (COLLECTIVELY, THE "ENVIRONMENTAL LAWS"). The Grantee hereby accepts the Real Property "AS IS WHERE IS WITH ALL FAULTS" subject to any problems arising in connection with the Real Property, including without limitation problems arising out of or in connection with deterioration of any improvements thereon, violations of the Environmental Laws, and potential flood hazards.

> By accepting this instrument, the Grantee agrees to indemnify and hold the Grantor harmless from any and all costs, expenses, and liability, including without limitation attorney fees, arising out of or in connection with any of the foregoing.

63. Thus, the Ogles agreed to accept the substantial liabilities that flowed from the environmental contamination on the site and agreed to indemnify Whaley and LD&S from all costs, expenses, and liability, including, without limitation, attorney fees, arising out of or in connection with any potential cleanup.

64. And if there were any doubt that the Ogles' intention all along was to prevent Plaintiffs from opening their liquor store and business complex, that concern was put to rest when the Ogles again announced their objective to the press. On April 26, 2024, the *Mountain Press* published an article titled: "Ogles plan attraction on Dolly Parton Parkway," in which Ron Ogle was noted as saying that he was prepared to go to Court to prevent the liquor store from being built, but that it became a "moot point" when he purchased the property.[3]

65. Thus, through their conspiracy, both parties usurped Plaintiffs' business opportunity for their own unjust benefit. The Webbs (through Whaley and LD&S) taught Plaintiffs a lesson for "Jewing around," extracted a price in excess of the appraisal value that they would have received had they not breached the agreement with Rocky Top, and avoided the potentially significant cleanup costs associated with the environmental issues on the property. And the Ogles, for their part, prevented Plaintiffs from developing and operating their business complex and from selling liquor, which the Ogles were determined to thwart.

[3] https://www.themountainpress.com/eedition/page-a12/page_a2853ea6-78ac-554c-b56c-b4fc06680420.html

## IV. Damage Caused by Defendants' Unlawful Scheme

66. The conduct detailed above breached the contracts that Whaley and LD&S had with Rocky Top, as well as the contracts Rocky Top had with KARS and RH1 had to acquire the land at 750 Dolly Parton Parkway, and resulted in the loss of significant business opportunities for Plaintiffs.

67. The results have been disastrous for Plaintiffs, as they have lost not only the substantial time and funds they have expended in pursuing the Project, but also lost profits and other damages from their lost business opportunity, including the inevitable loss of their liquor license, and the lost profits from the development or operation of the liquor store, the self-storage business, two restaurants, the retail space, and the Starbucks.

68. As if that were not enough, the Ogles continue to extort Plaintiffs, even going so far as to threaten Plaintiffs' future business opportunities. On or about May 2, 2024, Ron Ogle called a member of KARS, demanding that he convince the President of Rocky Top to sign a document related to the sale of the DP Property or that if he did not do so, he would refuse to let his company do any of the work Ogle was promising to him, and that he would "be out several millions of dollars."

69. Plaintiffs' damages and lost profits are estimated to be in excess of $50 million.

## CAUSES OF ACTION

### COUNT ONE
### (Breach of Contract by Rocky Top as Against LD&S)

70. Rocky Top repeats and realleges each and every allegation contained above as if fully set forth herein.

71. On or about April 1, 2019, Rocky Top and LD&S entered into the LD&S Agreement. A true and correct copy is attached as Exhibit 2. The LD&S Agreement is a valid

and enforceable agreement. Rocky Top has performed all of its obligations pursuant to the LD&S Agreement. Section 22.1 states:

> Provided that (i) the Term of this Lease has yet to expire and (ii) no state of facts then existed which constitute an event of default or which, with the passing of time or the giving of notice, would constitute an Event of Default, the Lessee shall have the right (at any time during the term of this Lease) to purchase the fee simple interest of the Lessor in the Leased Premises (the "Fee Interest") by tendering written notice to the Lessor of the Lessee's exercise of this right (the "Exercise Notice") and specifying the proposed closing date (the "Closing Date") on which the Lessee intends to close the purchase of the Fee Interest (the "Closing"), which Closing Date must occur after the determination of the Fee Interest Appraised Value. The Lessee's right to purchase the Fee Interest, pursuant to the terms and conditions of this Section 22, shall be referred to as the "Purchase Option."

72. On June 7, 2023, Rocky Top provided notice pursuant to Section 22.1 that Rocky Top was exercising its option to purchase the LD&S Parcel.

73. Prior to April 1, 2024, LD&S and Rocky Top agreed to extend the Closing Date for the purchase to May 1, 2024.

74. On April 2, 2024, LD&S sent a letter to Rocky Top falsely asserting that the Purchase Option had expired. Three days later, LD&S sent a follow-up letter, informing Rocky Top that it "now desire[s] to terminate any further discussions[.]"

75. LD&S breached the LD&S Agreement by, among other things, its failure to comply with its obligations under the LD&S Agreement, including by, among other things, terminating Rocky Top's Purchase Option.

76. As a direct, proximate, and foreseeable consequence of the foregoing breaches, Rocky Top has been damaged at an amount to be determined at trial.

## COUNT TWO
**(Breach of Contract by Rocky Top as Against Whaley)**

77. Rocky Top repeats and realleges each and every allegation contained above as if fully set forth herein.

78. On or about April 1, 2019, Rocky Top and Whaley entered into the Whaley Agreement. A true and correct copy is attached hereto as Exhibit 3. The Whaley Agreement is a valid and enforceable agreement. Rocky Top has performed all of its obligations pursuant to the Whaley Agreement.

79. Section 22.1 of the Whaley Agreement states:

> Provided that (i) the Term of this Lease has yet to expire and (ii) no state of facts then existed which constitute an event of default or which, with the passing of time or the giving of notice, would constitute an Event of Default, the Lessee shall have the right (at any time during the term of this Lease) to purchase the fee simple interest of the Lessor in the Leased Premises (the "Fee Interest") by tendering written notice to the Lessor of the Lessee's exercise of this right (the "Exercise Notice") and specifying the proposed closing date (the "Closing Date") on which the Lessee intends to close the purchase of the Fee Interest (the "Closing"), which Closing Date must occur after the determination of the Fee Interest Appraised Value. The Lessee's right to purchase the Fee Interest, pursuant to the terms and conditions of this Section 22, shall be referred to as the "Purchase Option."

80. On February 9, 2024, Rocky Top informed Whaley that "depending on the results of the appraisal that is currently being conducted, [Rocky Top] may be interested in purchasing both the Whaley parcel and the LDS parcel as part of this purchase option. . . . Let [Rocky Top] know if [Whaley] is agreeable."

81. Three days later, Whaley informed Rocky Top that it was "agreeable" to the proposal as long as the Purchase Option is exercised "in compliance with the terms in the Whaley [Agreement]."

82. Prior to April 1, 2024, Whaley and Rocky Top agreed to extend the Closing Date for the purchase to May 1, 2024.

83. On April 2, 2024, Whaley sent a letter to Rocky Top falsely asserting that the Purchase Option had expired on March 31, 2024. Three days later, Whaley sent a follow-up letter, informing Rocky Top that it "now desire[s] to terminate any further discussions[.]"

84. Whaley breached the Whaley Agreement by, among other things, its failure to comply with its obligations under the Whaley Agreement, including by, among other things, terminating Rocky Top's Purchase Option.

85. As a direct, proximate, and foreseeable consequence of the foregoing breaches, Rocky Top has been damaged at an amount to be determined at trial.

**COUNT THREE**
**(Breach of the Duty of Good Faith and Fair Dealing by Rocky Top as Against Whaley and LD&S)**

86. Rocky Top repeats and realleges each and every allegation contained above as if fully set forth herein.

87. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging and performing the parties' duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

88. Whaley and LD&S' bad-faith conduct as alleged herein violated the implied covenant of good faith and fair dealing inherent in every contract.

89. The losses and damages Rocky Top sustained as described herein were the direct and proximate result of Whaley and LD&S' breach of the implied covenant of good faith and fair dealing, and Rocky Top has been damaged at an amount to be determined at trial.

**COUNT FOUR**
**(Tortious Interference with Contract (the LD&S Agreement) [Common Law & Tenn. Code § 47-50-109] by Rocky Top as Against the Ogles)**

90. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

91. A valid and binding contract exists between Rocky Top and LD&S, the LD&S Agreement. *See* Ex. 2.

92. The Ogles had actual knowledge of the LD&S Agreement.

93. By conspiring with LD&S and the Webbs to persuade them to breach the LD&S Agreement and sell the land to the Ogles in violation of the LD&S Agreement, the Ogles intentionally and improperly interfered with Rocky Top's contractual relationship with LD&S.

94. The predominant purpose of the Ogles' interference with Rocky Top's contractual relationships was to cause harm to Rocky Top and Plaintiffs.

95. The Ogles acted improperly, without privilege, and purposefully with the intent to injure Rocky Top and Plaintiffs, thereby tortiously interfering with Rocky Top's contractual relationships with LD&S.

96. As a direct and proximate result of the Ogles' conduct, Rocky Top has suffered and continues to suffer damages.

97. Rocky Top is therefore entitled to recover from the Ogles treble the amount of damages resulting from the breach of the LD&S Agreement, as determined at trial, pursuant to Tenn. Code § 47-50-109.

**COUNT FIVE**
**(Tortious Interference with Contract (the Whaley Agreement) [Common Law & Tenn. Code § 47-50-109] by Rocky Top as Against the Ogles)**

98. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

99. A valid and binding contract exists between Rocky Top and Whaley, the Whaley Agreement. *See* Ex. 3.

100. The Ogles had actual knowledge of the Whaley Agreement.

101. By conspiring with Whaley and the Webbs to persuade them to breach the Whaley Agreement and sell the land to the Ogles in violation of the Whaley Agreement, the Ogles intentionally and improperly interfered with Rocky Top's contractual relationship with Whaley.

102. The predominant purpose of the Ogles' interference with Rocky Top's contractual relationships was to cause harm to Rocky Top and Plaintiffs.

103. The Ogles acted improperly, without privilege, and purposefully with the intent to injure Rocky Top and Plaintiffs, thereby tortuously interfering with Rocky Top's contractual relationships with Whaley.

104. As a direct and proximate result of the Ogles' conduct, Rocky Top has suffered and continues to suffer damages.

105. Rocky Top is therefore entitled to recover from the Ogles treble the amount of damages resulting from the breach of the Whaley Agreement, as determined at trial, pursuant to Tenn. Code § 47-50-109.

## COUNT SIX
**(Tortious Interference with Contract (the LOI )[Common Law & Tenn. Code § 47-50-109] by Rocky Top and KARS as Against All Defendants)**

106. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

107. The LOI was a valid and binding contract between Rocky Top and KARS. *See* Ex. 1.

108. Defendants had actual knowledge of the LOI.

109. By asserting bad-faith justifications to improperly terminate the LD&S Agreement and the Whaley Agreement, Whaley, LD&S and the Webbs sought to preclude Rocky Top from exercising its Purchase Option, thereby depriving KARS of the commercial lease it was entitled to in order to build, develop, and operate the Project, in violation of the LOI, thereby intentionally and improperly interfering with KARS and Rocky Top's contractual relationship.

110. By conspiring with Whaley, LD&S and the Webbs to preclude Rocky Top from exercising its Purchase Option—thereby depriving KARS of the commercial lease it was entitled to in order to build, develop, and operate the Project, in violation of the LOI—the Ogles intentionally and improperly interfered with KARS and Rocky Top's contractual relationship.

111. The predominant purpose of Defendants' interference with KARS' contractual relationships was to cause harm to KARS and Rocky Top.

112. Defendants acted improperly, without privilege, and purposefully with the intent to injure KARS, thereby tortiously interfering with KARS' contractual relationships with Rocky Top.

113. As a direct and proximate result of Defendants' conduct, KARS and Rocky Top have suffered and continue to suffer damages.

114. KARS and Rocky Top are therefore entitled to recover from Defendants treble the amount of damages resulting from the breach of the LOI, as determined at trial, pursuant to Tenn. Code § 47-50-109.

**COUNT SEVEN**
**(Tortious Interference with the RH1 Agreement [Common Law & Tenn. Code § 47-50-109] by RH1 and Rocky Top as Against All Defendants)**

115. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

116. A valid and binding oral contract exists between Rocky Top and RH1, pursuant to which RH1 was going to procure land from Rocky Top for the construction and development of a business complex on the DP Property (the "RH1 Agreement").

117. Defendants had actual knowledge of the RH1 Agreement.

118. By asserting bad-faith justifications to improperly terminate the LD&S Agreement and the Whaley Agreement, Whaley, LD&S and the Webbs sought to preclude Rocky Top from exercising its Purchase Option, thereby depriving RH1 of the property it was entitled to in order to build, develop, and operate the Project, in violation of the RH1 Agreement, thereby intentionally and improperly interfering with RH1 and Rocky Top's contractual relationship.

119. By conspiring with Whaley, LD&S and the Webbs to preclude Rocky Top from exercising its Purchase Option, thereby depriving RH1 of the property it was entitled to in order to build, develop, and operate the Project, in violation of the RH1 Agreement, the Ogles intentionally and improperly interfered with KARS and Rocky Top's contractual relationship.

120. The predominant purpose of Defendants' interference with RH1's contractual relationships was to cause harm to KARS and Rocky Top.

121. Defendants acted improperly, without privilege, and purposefully with the intent to injure RH1, thereby tortiously interfering with RH1's contractual relationships with Rocky Top.

122. As a direct and proximate result of Defendants' conduct, RH1 and Rocky Top have suffered and continue to suffer damages.

123. RH1 and Rocky Top are therefore entitled to recover from Defendants treble the amount of damages resulting from the breach of the RH1 Agreement, as determined at trial, pursuant to Tenn. Code § 47-50-109.

**COUNT EIGHT**
**(Tortious Interference with Business Relations by Rocky Top and KARS as Against All Defendants)**

124. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

125. A business relationship existed between Rocky Top and KARS.

126. Defendants had actual knowledge of the business relationship, as demonstrated by Lynn Webb and Ron Ogle's statements and conduct.

127. Defendants intended to cause breach of the business relationship. Lynn Webb, for his part, intended to cause a breach of the business relationship to teach Plaintiffs a lesson for "jew[ing] around." Ron Ogle intended to cause a breach of the business relationship because his publicly stated goal was to prevent Plaintiffs from developing and operating their businesses and retail package store license, as evidenced by his statements to the press.

128. By conspiring with Whaley, LD&S and the Webbs to preclude Rocky Top from exercising its Purchase Option, thereby depriving KARS of its ability to build, develop, and operate the Project and its retail package store license, Defendants intentionally and improperly interfered with business relationships.

129. As a direct and proximate result of Defendants' conduct, KARS and Rocky Top have suffered and continue to suffer damages.

130. KARS and Rocky Top are therefore entitled to recover from Defendants damages to be determined at trial.

**COUNT NINE**
**(Tortious Interference with Business Relations by Rocky Top and RH1 as Against All Defendants)**

131. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132. A business relationship existed between Rocky Top and RH1.

133. Defendants had actual knowledge of the business relationship, as demonstrated by Lynn Webb and Ron Ogle's statements and conduct.

134. Defendants intended to cause a breach of the business relationship. Lynn Webb, for his part, intended to cause a breach of the business relationship to teach Plaintiffs a lesson for "jew[ing] around." Ron Ogle intended to cause a breach of the business relationship because his publicly stated goal was to prevent Plaintiffs from developing and operating their businesses and retail package store license, as evidenced by his statements to the press.

135. By conspiring with Whaley, LD&S and the Webbs to preclude Rocky Top from exercising its Purchase Option, thereby depriving RH1 of its ability to build, develop, and operate the Project, Defendants intentionally and improperly interfered with business relationships.

136. As a direct and proximate result of Defendants' conduct, RH1 and Rocky Top have suffered and continue to suffer damages.

137. RH1 and Rocky Top are therefore entitled to recover from Defendants damages to be determined at trial.

## COUNT TEN
## (Fraudulent Misrepresentation by Plaintiffs as Against Whaley and LD&S)

138. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

139. Whaley and LD&S, through their counsel, directly made representations to, and omitted material facts from, their representations to Rocky Top concerning its agreement to Rocky Top's exercise of its purchase option on the Whaley Parcel, and extensions of the closing date for the purchase of the Whaley and LD&S Parcels.

140. This included, among other things, misrepresentations that Whaley and LD&S were "agreeable to your client exercising the Purchase Option in the Ground Lease with Whaley Properties, Inc." and that Whaley and LD&S were agreeable to extending the closing date for the option purchase of the Whaley and LD&S Parcels to May 1.

141. Whaley and LD&S' representations were materially false and misleading when made. These representations were made intentionally or with reckless disregard for the truth.

142. Rocky Top reasonably and justifiably relied to its detriment on Whaley and LD&S' representations misrepresentations and omissions. Whaley and LD&S' misrepresentations induced Plaintiffs to conduct Phase II studies of the land and push the closing date for the option purchase of the Whaley and LD&S Parcels, which it would not have done had it known the truth.

143. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer damages.

144. Plaintiffs are therefore entitled to recover from Defendants damages to be determined at trial.

**COUNT ELEVEN**
**(Unjust Enrichment by Plaintiffs as Against All Defendants)**

145. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

146. As a result of Defendants' conduct, Defendants have been unjustly enriched at the expense of Plaintiffs. The law thereby implies a contract by which Defendants must pay Plaintiffs the amount by which, in equity and good conscience, Defendants have been unjustly enriched at the expense of Plaintiffs.

**COUNT TWELVE**
**(Civil Conspiracy by Plaintiffs as Against All Defendants)**

147. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

148. Defendants had a meeting of the minds with the object of accomplishing the tortious conduct as alleged herein and to cause harm to Plaintiffs.

149. Defendants did perform one or more unlawful, overt acts in furtherance of accomplishing their objective, as alleged herein.

150. As a result of Defendants' common design, concert of action and overt acts in furtherance of the tortious conduct as alleged herein, Plaintiffs have suffered damages.

151. The actions of Defendants constitute a civil conspiracy and, as civil co-conspirators, each of Defendants is liable for all damages occasioned by the actions of any of the conspirators.

152. Defendants' acts described herein were knowing, intentional, willful, malicious, and without justification or authority, thus entitling Plaintiffs to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment be entered as follows:

a. On counts 1-6, 7-12, awarding compensatory damages to Rocky Top in an amount to be determined at trial, together with interest, attorneys' fees, costs and disbursements;

b. On counts 6-8, 10-12, awarding damages to KARS in an amount to be determined at trial, together with interest, attorneys' fees, costs and disbursements;

c. On counts 7, 9-12, awarding damages to RH1 in an amount to be determined at trial, together with interest, attorneys' fees, costs and disbursements;

d. Plaintiffs specifically request treble damages, punitive damages, together with interest, attorneys' fees, costs and disbursements; and

e. Granting such other and further relief as the Court may deem just and proper.

Dated: Sevierville, Tennessee
May 23, 2024

By: [signature]
Travis D. McCarter
117 Court Avenue
Sevierville, Tennessee 37862
(865) 429-3600

*and*

KASOWITZ BENSON TORRES LLP

By: **/s/ Nicholas A. Rendino**
Nicholas A. Rendino (*pro hac vice* forthcoming)
Joshua E. Roberts (*pro hac vice* forthcoming)
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiffs*