UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF TENNESSEE (KNOXVILLE)

JESSICA STRODE

Plaintiff, .

VS. CASE NO. 3:25-cv-00611-KAC-DCP

CITY OF SEVIERVILLE,

Defendant.

---

DEPOSITION
DUSTIN SMITH
October 14, 2026

---

APPEARANCES

FOR THE PLAINTIFFS:

ROBERT F. CROSKERY, ATTORNEY AT LAW
Croskery Law Offices
The Highland Towers, No. 2200
Cincinnati, Ohio 45202

FOR THE DEFENDANT:

JOHN T. BATSON, JR, ATTORNEY AT LAW
Watson, Roach, Batson & Lauderback PLC
900 Gay Street
Knoxville, Tennessee 37902

INDEX

DUSTIN SMITH

DIRECT EXAMINATION BY MR. CROSKERY 4

CROSS EXAMINATION BY MR. BATSON 45

REDIRECT EXAMINATION BY MR. CROSKERY 46

EXHIBITS

| | | |
|---|---|---|
| No. 1 | Joint Motion & Agreed Order | 8 |
| No. 2 | News Article (Mountain Press) | 9 |
| No. 3 | Retail Package Store Online Application<br>Retail Package Store Certificate of Compliance | 46 |

S T I P U L A T I O N

The deposition of DUSTIN SMITH, taken by agreement of counsel, for all purposes allowable under the Federal Rules of Civil Procedure, before Verna Mansfield, Licensed Court Reporter for the State of Tennessee, on the 14th day of October, 2026.

It is agreed that the reporter may swear the witness, take the deposition stenographically, and reduce the same to typewritten form, and that all formalities touching caption, certificate, filing, transmission, etc., are expressly waived.

It is further agreed that all objections except as to the form of the questions are reserved to on or before the hearing.

DUSTIN SMITH,

called as a witness, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CROSKERY:

Q Please state your full name.

A Dustin Smith.

Q And, Mr. Smith, I assume that I can reach you through Mr. Batson, who is across the table from me; is that right?

Q That is correct.

A Have you ever had your deposition taken before?

A Not in a City manner such as this.

Q But you have had it taken before?

A Yes.

Q All right. A simple process. The court reporter on my left and your right is taking down everything that each of us say. Just a few rules to make sure we get a clean transcript. First of all, if you could answer out loud instead of nodding your head, I would appreciate it.

A Sure.

Q And if you could use yes or no as opposed to uh-huh or huh-uh, we will get a clear record.

A Okay.
Q Will you do that for me?
A Yes.
Q If at any time you don't understand one of my questions, let me now and I will be happy to rephrase it for you; fair enough?
A Okay.
Q If you answer my question, I will naturally assume that you understood the question, so don't hesitate to tell me if I need to change something to make it clear.
A Okay.
Q Fair enough?
A Yes.
Q Also, if you need to take a break for some reason, although I don't anticipate this will be all that long, let me know and we will take a break. I am just here to find out what you know.
A Okay.
Q Mr. Batson and I have put a joint motion on the record. I am just going to read a little part of it and we are going to make this Exhibit 1 to this deposition, but basically this joint motion limits the subjects that I will be asking you about today, Mr. Smith, and that is fortunate because it

will make it shorter. It is unfortunate in that you will probably have to come back again sometime in the future to continue this.

And the reason for that is, one of the parties in the case under the First Amended Complaint is Cars LLC; and although they have been given informal notice, they are not yet formally in the suit and we want to give them a chance also to participate, but there were some pressing matters that I need to deal with on behalf of my client, that meant that we needed to go forward today. So I apologize for the fact that you may be coming back.

A Understood.

Q The part of the Motion that I am reading into the record is at the top of Page 2, and this is Document 37, Page 452. "Counsel shall limit their examination of Mr. Smith on October 14th, 2026, to the statements attributed to Dustin Smith in the newspaper article published on April 27 to 28, 2024, in the Mountain Press. See Document 28-1, Number 339 through 340. The factual circumstances underlying those statements and the City's contemporaneous understanding of the procedures applicable to the remaining applicants in the liquor store selection process."

MR. CROSKERY: Did I get that correctly, Mr. Batson?

MR. BATSON: I think you read it correctly, but if we are going to put it in the record by exhibit, that is fine too. You don't need to go back over it.

MR. CROSKERY: All right. I am going to put it in the record by exhibit, but I read that so you would understand what I was going to be asking you about.

MR. BATSON: I do maybe want to clarify for the record one thing. This was filed as a joint motion and Proposed Agreed Order and it has been submitted to the Court. They may eventually issue their own order. It is an agreement between us, but it is not officially an order, and so I wanted to make sure we got it into the record in case Cars has something to add to it later on, they will know that we have gone through all of this.

MR. CROSKERY: I think that makes good sense. Of course, the part I was reading was for your benefit, but Mr. Batson is absolutely correct. Cars may have something they want to say about it at sometime or another.

(The Joint Motion and Agreed Order was marked Exhibit No. 1 and attached.)

BY MR. CROSKERY:

Q I think I went through all of the rules with you. So before we get into the article, just let me get a little bit of background on you so I understand a little bit about who you are. You look pretty young. How old are you?

A I am 36.

Q And what is your current job?

A City Administrator.

Q And I understand that back when this article came out, which was in April 27 to 28 -- I guess it is a weekend paper -- April 27 to 28 of 2024. What was your job back then?

A I would have been the Deputy Administrator at that time.

MR. BATSON: I am not trying to tailgate you a little bit. Do you have an extra copy -- because you are going to be asking about that. Do you have an extra copy? I think I have got one somewhere.

MR. CROSKERY: Of the article?

MR. BATSON: Of the article.

MR. CROSKERY: Oh, absolutely. I will

give one to you, Mr. Batson. Here, you can take one now, if you like.

MR. BATSON: Thank you.

MR. CROSKERY: I haven't marked it as an exhibit yet, but since that is what we were going to be talking about today, I figured I would bring along an extra copy.

MR. BATSON: Okay.

BY MR. CROSKERY:

Q So at one time -- let's see -- did I hear you were the Deputy City Administrator?

A That is correct.

Q Okay. And when did you switch from Deputy City Administrator?

A It would have been at the City Administrator's retirement, which would have been in January of, I believe, of 2024.

Q Well, this article came out in January 2024; so maybe January of 2025? It was '24. So when this article came out, you were already the Deputy City Administrator; is that right?

A I would have to clarify the dates on that.

(The newspaper article was marked Exhibit No. 2 and attached.)

Q Because you are quoted towards the bottom

of this. If you will look at the second page, the second paragraph down, it will probably clarify it. There is a quote attributed to you. It says, "If it comes to fruition, it will be good for the City, Deputy Administrator Dustin Smith said."

A So, yes, so it would have been January of 2025.

Q Okay. Right now I am just concerned a little bit with the dates. So up until January of 2025, you were the Deputy City Administrator, and then when the City Administrator -- who was that?

A Russell Treadway.

Q When Russell Treadway retired, you then became the City Administrator?

A Yes.

Q Now do you have any other jobs that you do? Do you have a part-time job or business?

A No, that is all.

Q You are full time?

A Yes.

Q Okay. So let's go back to what the responsibilities of the Deputy City Administrator would have been in that timeframe, April 27 to 28, of 2024.

A Sure. So my direct reporting departments

were Planning and Development, and then the Information Services, which is the IT department.

Q What is your background for that?

A I have a Master's in Public Administration.

Q From?

A East Tennessee State University.

Q ETSU, okay. And did you have any other jobs before you became the Deputy City Administrator?

A Yes. So it was with the City. So before I was Deputy City Administrator, I started with the City as a Planner and was then promoted to the Development Director and then the Deputy City Administrator.

Q So you are on your fourth position with the City. You started as a Planner, became a Development Director, then the Deputy City Administrator, and then the City Administrator?

A Correct.

Q Okay. And can you give me rough timeframes for that?

A Yeah, I believe it was 2015 when I started with the City.

Q As a Planner?

A Yes.

Q And then you became a Development Director when?

A 2018, 2019.

Q Okay. And then we have already gone through -- well, when did you become the Deputy City Administrator, before or after COVID? That is a good benchmark.

A After COVID, so 2025, 2024 probably.

Q So did you have -- as the Deputy City Administrator -- let's focus on that timeframe since that is what this article that has been marked Exhibit 2 was about. What were your duties in regard to the liquor licensing procedure that had just been voted on and approved by the voters?

A Sure. And we -- obviously, part of that role was just general support of the City Administrator in that it was just an involvement of the discussion of what the lottery process -- or, you know, what the process in general would look like. And we ultimately ended on the lottery process, and then working with our City legal team to, you know, draft the Ordinances and Resolutions that were ultimately passed. And then I was also tasked with the setting up of the application

process and then a subsequent vetting of the approved applicant in the lottery process -- or the selected applicants to the lottery process.

Q Well, all right. That would have been my next question. We know a little bit about the application process, but I would like for you to You go into a little bit more detail for me. When you, as the Deputy Administrator, helped set up the application process, just explain what that entailed.

A Well, sure. So the initial part of that was to set up a landing page on our City website that just kind of listed what the process looked like, what the required documentation was to be submitted, and dates, and just the general way out of information and timelines that would be required.

And then we also have a, like, application portal that fits through a software -- there is a service company called MyGovernmentOnline, so we then worked with their development team on, you know, setting up the actual application portal system where the applicants would go in and fill out all of the necessary information and upload the necessary documentation.

Q All right. So the City at the front end

told the applicants what documents to upload?
A Correct.
Q Okay. Was there a financial portion that needed to be uploaded at that point?
A Yes, correct.
Q Okay. Tell me what financial documents the City was looking for?
A I don't remember exactly off of the top of my head. We were following exactly what TABC would ultimately be submitted, but there were credit checks involved. There were bank statements involved in that position, I believe. So there was several different financial documents that would have been required to be submitted.
Q All right. And in addition to the financial documents --
A I think W-2 or tax documentation was part of that as well.
Q Thank you. And in addition to the W-2s, bank statements, credit checks, was there any other financial information that you required, or do you know?
A I would have to go back and look and see exactly what those requirements are.
Q Fair enough. Now in addition to the

financial documents, what were the other types of things that were supposed to be uploaded through the application portal; do you remember?

A Yeah. So one of them was your identification, driver's license, proof of ownership or ability to acquire premises, background check information and there was also an actual, like, separate Part 1 and Part 2 of a document that we had put out there for the application process that required, you know, just general information on ownership, names, et cetera.

Q Okay. Now I want to hone in on what you just mentioned, the ability to acquire the premises. If you didn't own the premises, you did have the ability to show, here is a document that shows we can acquire the premises; is that right?

A That is correct. That is correct.

Q So essentially, Cars LLC is the applicant that wins the lottery; is that right?

A Correct.

MR. BATSON: For Zone 3.

MR. CROSKERY: I'm sorry?

THE WITNESS: For Zone 3.

MR. BATSON: For Zone 3.

MR. CROSKERY: For Zone 3.

MR. BATSON: I'm sorry. There are five zones.
MR. CROSKERY: No, Mr. Batson is absolutely correct. There are five zones and I should have made that clear.
BY MR. CROSKERY:
Q Which made them the winning applicant assuming they met the other requirements?
A Correct.
Q Okay. And you mentioned the ability to acquire the premises. Did Cars LLC own the premises that they were indicating that they would put up a liquor store on?
A No. They had provided proof that they had the ability to lease or acquire.
Q Okay. And was that an ability that was certain, or did it depend upon another party?
A It -- I don't remember specifically exactly what it was. I would have to go back in and look at the entirety of that document but, you know, in this whole process, we did not require you to be under a lease for any of the applicants at the time that the lottery was drawn because, you know, it would be forcing them to acquire a lease that they may ultimately not have.

Q Of course.
A So we just needed proof of the ability.
Q So you needed something like an option to purchase a property, an option to lease the property?
A Option, Letter of Intent, Memorandum of Understanding. It could have been any one of those.
Q Something that showed that you had the ability to get legal control of those premises at the time that the liquor store would be built; is that right?
A Well, at the time that the Certificate of Compliance was issued, they just had to show proof that they had the ability to do so.
Q Was there any -- in the application, was there any notation that the City would follow up and make sure that you did properly acquire the premises?
A That would have been handled through the timeframe process.
Q Meaning?
A That they had 12 months from the date of the issuance of the Certificate barring any extensions that the passage of time would have been a revocation of that Certificate.

Q All right. I appreciate that. Now since this is about the newspaper article and the facts and the circumstances surrounding it, let's take a look at this article for a moment. Are you familiar with this article?
A Yes.
Q All right. When is the last time you looked at it?
A This morning actually in preparation for this.
Q Did you review any other documents in preparation for your deposition this morning?
A No, just after my conversation with Mr. Batson yesterday.
Q Okay. Now, wait. Don't tell me anything that you said to Mr. Batson or anything he said to you, but do give me a little help here. About how long did you and Mr. Batson talk in preparation for this?
A For this specific deposition, it was just yesterday talking about the limitations of what we would be discussing.
Q All right. Was that a five-minute call, ten-minute call?
A Yeah, not even five minutes.

Q All right. And have you talked to counsel -- and again, without telling me anything you said to counsel or they said to you, have you talked to counsel about this particular lawsuit of Strode against the City of Sevierville at other times?

A Yes.

Q How many other times have you spoken to Counsel about this lawsuit?

A I can't answer that. There has been several discussions, phone calls throughout the onset of the case.

Q I understand. Would you say that you have spoken to counsel about it for hours, minutes?

A Minutes.

Q Okay. Several different sessions of a few minutes apiece; is that right?

A Yes.

Q Okay. I appreciate it. Let's look at this particular article. Oddly enough, Cars LLC is not what the article is about. It is about somebody named Ron and Betty Ogle. Do you know who Ron and Betty Ogle are?

A Yes.

Q Who are Ron and Betty Ogle?

A Ron, before he passed, was just a local developer in town, who we had quite frequent dealings with, and he was a -- he owned several tracts of property and Betty was his wife.

Q Now, as I understand it, the tract of property where this liquor store is going to be built if all goes according to plan for the liquor store is property that was once owned by Ron and Betty Ogle; is that right?

A At one point in time, yes.

Q All right. And there is a statement here that they bought the property at 750 Dolly Parton Parkway for $2 million earlier this month, the former site of Rocky Top Ford. So is that where the liquor store is going in, 750 Dolly Parton?

A That is correct. I believe that to be the address.

Q Okay. Now they mentioned Family Entertainment as a destination for the Southeastern United States as their plan, some sort of attraction. Did that ever go through?

A No, it didn't.

Q Okay. But at least as of April of 2024, they were discussing this attraction. So what is the relationship, if you understand it, between Cars

LLC and this property that was at that time owned by the Ogles?

A I was not involved in any conversations between the two of them.

Q Well, let's go on a lot little farther down. The City -- let's go through some of these plans because as a relative newcomer to the area, I am not as familiar with some of these things as I probably would like to be. It mentions that the City plans to close the portion of road on the other side of Robert Henderson once they connect it to Veterans Boulevard. What is that talking about?

Q That is correct. So through Tennessee Department of Transportation, Veterans Boulevard is currently a project underway. A new bridge will be built across the river and connect in at Robert Henderson Road, and then further more on down to Highway 66.

So in the State's plans of that, the current bridge on Robert Henderson Road that is slightly connected to this property was to be removed and closed.

Q All right. And that hasn't happened yet, but that is in the plans?

A It is underway, construction is underway,

but that has not happened yet, no.
Q Okay. And it mentions the property is already zoned for arterial commercial use, which would allow for an attraction the size planned by the Ogles. Now I understand this attraction never came to fruition, but you were familiar with the zoning. What is in the City of Sevierville when you say arterial commercial use, what does that mean?
A That is the zoning designation for what is basically along the arterial roads within the City. So it typically allows for, you know, a higher dense use, you know, geared more towards commercial activity.
Q Okay. Now the article goes on -- and this is of some interest to me -- the article goes on to say, "The move also brought an end to a dispute between the City and the Ogles over the liquor store that had been proposed at the site."
Do you see that? That is the second column, second page?
A Yes.
Q Okay. And I assume you have some familiarity with this?
A Yes.
Q Tell me about that. What was the dispute

between the City and the Ogles about the liquor store?

A As you see in the next paragraph there, there was nothing formally filed, but we had received a letter indicating that -- sorry, the third paragraph there that they believed that -- Mr. Ogle believed that that location would violate the regulation based on a thousand foot boundary requirements from church property.

Q So there was a church somewhere around there, but it happened to be rented or leased; is that right?

A It was in a tenant space.

Q I see. All right. And because it was a tenant space, it didn't --

A Own the property so it was not considered a church property.

Q I see, okay. The next paragraph after that, "Ogle said Friday he had been ready to take the dispute to Court, but it became a moot point when he got the chance to buy the property."

So I am trying to understand this. In April of 2024, this liquor licensing situation, Cars LLC had already been selected as the winning applicant in Zone 3; hadn't they?

A That is correct.
Q But at that point it looks like Ron and Betty Ogle owned the property and were planning on putting an attraction there; is that right?
A That is the understanding.
Q So what happened to go from the Ogles planning to put an attraction on this property, which was a former Ford dealership, that led to a group of businessmen having control over it?
A I am not familiar with the personal dealings of how Mr. Ogle came to acquire the property.
Q Did Mr. Ogle come to acquire the property?
A All indications are, yes, Mr. Ogle acquired the property.
Q So as a point when the application has been submitted and when Cars LLC has been selected as the winning applicant for Zone 3, at that point Ron Ogle is saying, I own this property and I don't want a liquor store there; is that right?
A The Certificate had already been issued by the time Mr. Ogle acquired the property.
Q I understand, he owns it at this point at least, and I assume he passes away shortly thereafter?

A At some point shortly thereafter. I don't remember exactly when.
Q All right. So Mr. Ogle and Betty Ogle own the property. They are planning on putting an attraction on it?
A Yes.
Q It says so right in this article. You are familiar with that?
A Yes.
Q You were interviewed about it. But at the same time Ron Ogle says, I don't think that you can put a liquor store here because it is too close to a church. The City says, no, the church is a rented facility so you can still put one there. But at this point, before Ron Ogle dies, he owns the property. He obviously doesn't want a liquor store there because he says he is willing to sue about it. And what I am wondering is, how the City investigated or got to the point where Cars LLC, the winning applicant, actually ends up being able to open the store there. Was there any action taken by the City?
A No. The Certificate had already been issued at that point in time for a 12-month period.
Q So the rule said that you had 12 months to

get the property or --

A To open the store.

Q Open the store, okay.

MR. BATSON: When you say the rule, what do you mean by the rule?

Q Do you understand what he meant by the rule?

A Well, the Ordinance.

Q Yeah, okay, the Ordinance. So the Ordinance said in it that the winning applicant would have 12 months to open the store; is that right?

A Yes.

Q Okay. Well, I think I have got most of that cleared up in my mind. I want to go down to this paragraph which resulted in this lawsuit.

First, let me back up on two things. Did the initial portal ask for the financial documents, or were they submitted if the winning applicant was selected?

A No. There was a set date that those were supposed to be submitted by.

Q Some documents were submitted through the portal?

A All documents were submitted through the

portal.

Q Okay. All right. And also, do you know when the property actually passed from the Ogles' hands -- I guess it would be the estate of Ron Ogle and Betty Ogle, assuming that he still owned it, to any other entity? Do you know when that transfer took place?

A Can you repeat the question?

Q Yes. Do you know -- at some point Ron Ogle and Betty Ogle transferred the property; is that right?

A That is my understanding, yes.

Q All right. Do you know when that took place?

A I do not know the specific date. It would have been within the last year.

Q Do you know whether or not Ron and Betty Ogle owned the property when that two-month period -- or that 12-month period -- let me start over again so I get the question right. Do you know whether or not Ron and Betty Ogle owned the property when the initial 12 months expired from the date that Certificate was issued allowing Cars LLC to open the liquor store within 12 months?

A I believe that they would have been the

owner of record at the time and that they were -- that we would have been made aware at that point in time that there was ongoing litigation regarding the validity of that ownership.

Q Were you made aware that there was ongoing litigation regarding the validity of the ownership?

A Yes.

Q When were you made aware of that dispute and that litigation?

A It was published publicly in various newspapers is how we first became aware of it, but then prior to the expiration of the initial 12 months, we were made aware, through a representative of Cars LLC, that they were in ongoing litigation.

Q So you were not made aware by Cars LLC prior to the expiration of 12 months --

A That is incorrect.

Q Wait, let me finish the question. You were not made aware by Cars LLC prior to the expiration of the 12 months that they owned the property or that they owned the rights to the property. You were made aware that they were in ongoing litigation about whether or not they had the right to the property; is that accurate?

A Yes.

Q All right. So was a copy of that ongoing litigation sent to the City?
A We had seen it through the various -- we had copies of it. It was not sent to us specifically by Cars, but we had the information about it.
Q All right. So this notification that you got from Cars LLC, was that verbal or in writing?
A There was an initial verbal conversation followed up by a formal email request.
Q So the initial verbal conversation, was that a conversation that you had, Mr. Smith?
A Yes, correct.
Q And with whom are you speaking from Cars LLC?
A Stacy Champagne, Steve Champagne.
Q Steve Champagne?
A Yes.
Q Is that spelled like C-H-A-M-P-A-G-N-E?
A Yes, I believe so.
Q Just like the French type of -- to be Champagne it has got to be from Champagne, France; otherwise, it is just sparkling wine.
Okay. Steve Champagne, who was Steve Champagne?

A He is one of the partners in Cars LLC.
Q All right. So Steve Champagne, a partner in Cars LLC, calls you up prior -- just prior to the end of the 12-month period or --
A Yeah. I don't remember exactly when that conversation took place.
Q Just prior. And tell me, and I don't want to put words in your mouth, but you tell me as best as you can what Mr. Champagne said to you and what you said to Mr. Champagne.
A Mr. Champagne just explained in various layman terms and very limited details, I suppose, of what he could discuss regarding their litigation and what the ultimate result of that would be and asked about what the extension process would look like. So I explained to him what the extension process would entail and asked him to send me a request through email.
Q Okay. I'm not going to get into the weeds on that yet because right now we are just talking about the newspaper article. This is just what it leads to. But the request -- so you asked him for a written request. Now, eventually, I am assuming that you got a written request for an extension?
A An email, yes.

Q In an email. Did that email outline that the reason that they were asking for the request is that they were in litigation over the ownership of the property?

A I don't remember the specific language without having it in front of me, but it was -- there was notification they were in ongoing litigation, I know that, but I don't remember the specifics of the actual --

Q You believe that was in an email, though?

A It was.

Q Do you know whether or not that email that you are talking about that discussed that there was ongoing litigation has been produced for your counsel?

A It has.

Q Okay. All right. Let's -- we have been going about 40 minutes now. I probably should talk to my client for a minute. Would it be all right if we took a few minutes for a break?

MR. BATSON: Sure.

MR. CROSKERY: I will step out of the room and call my client.

(Brief recess.)

Q Let's go back on the record. So, Mr.

Smith, you had just finished telling me about the fact that there was an extension process. And as I understand it, there were actually three zones that got extensions at the end of that process.

A I believe that to be correct, yes.

Q All right. But this particular extension might have been at little different than the other two. As I understand the circumstances of this extension, the other two extensions were for liquor stores that were already in the process of being constructed; is that right?

A I don't believe that construction had commenced necessarily on at least one of them.

Q All right. Well, one of them was already starting, and the one had not yet started to be constructed?

A I can't recall exactly whether they were -- whether one or not; but, yes, I mean, at least one of them had not commenced construction.

Q But we can agree that the Cars LLC had not commenced construction because they didn't even own the land yet; right?

MR. BATSON: Object to the form of the question. You can answer it.

Q Let me clean up the question because I

want to make sure it is right. Had Cars LLC started construction?

A They had not commenced construction at that time, no.

Q In fact, couldn't commence construction at that time because they didn't control the property at that 12-month period.

MR. BATSON: Object to the form of the question.

Q Did they control the property at the end of that 12-month period?

A That was what was under litigation.

Q So in other words, it was under litigation whether or not they could control the property, so we can infer that they didn't control the property at that point, true?

MR. BATSON: Object to the form of the question.

A Yeah, that was what was under litigation.

Q All right. Okay. So in any event, they got the 12-month extension. Was the extension -- did the extension mention in it that the Cars LLC was under litigation to get the property?

A I believe so. I don't remember exactly what was included in -- whether the email was

specifically included in the board documentation that was provided or it was in a memo, but I believe it was provided.

Q Okay. You mentioned a memo. Was there some sort of public memo that came out?

A Yes. It would have been part of -- we published our agendas and board packets, if you will, prior to meetings.

Q And somewhere in that memo and board packet is a description that Cars LLC was in litigation as to whether or not --

A If my memory serves me correctly, it was either in a memo or the email would have been provided as part of the packet, but I don't remember specifically.

Q All right. Was the actual lawsuit included?

A No, it would not have been included.

Q Was there a statement as to what the lawsuit was at that time?

A I don't believe that that would have been.

Q I didn't ask that very well. Was there a statement that gave the case number and where the suit was located and that sort of thing?

A No.

Q Okay. Well, we are going back to facts and circumstances about this article. And the next paragraph I am interested in now that we have talked a little bit about the Cars side is the paragraph where you say, and this is the third column of the second page, third paragraph down, "If that site is eliminated" -- talking about the Cars site, "If that site is eliminated, Smith said the opportunity to build a liquor store would pass down to Jessica Strode who proposed a site at 1341 Dolly Parton Parkway currently the site of the Gym Bar and Grill."

Did I read that correctly?

A Yes, you did.

Q So at this point you are speaking as the Deputy City Administrator because that was your position. What made you say to the Mountain Press that it was Jessica Strode's site which would be next in line?

A Sure. And I am not sure -- that is a direct quote so I am not -- I don't remember exactly the way that I worded that to the Press, but if through the application process, the locations were mapped on a geographic representation that already had the buffer zones, the distance requirements from

the various churches, schools, et cetera. So we knew, just based off of a visual mapping representation, that the other locations would not have met distance requirements. The applications had not been vetted in fullness.

Q Now I may have understood this wrong, but were there five applications that were successful?

A Yes.

Q Okay. So of the five applications, you looked at them and three of them would not have met the distance requirements from church and schools?

A Off of a visual representation, yes.

Q Okay. I understand. But hers, the Gym Bar and Grill would have met that distance requirement?

A Correct.

Q Okay. I understand. So assuming that the Cars site was eliminated, that is the reason why -- and I understand, these are not your exact words, but that is the reason why hers would have been the next site that the opportunity would have passed down to?

A The opportunity.

Q Okay. All right.

A And we would have still vetted the

remaining applications in fullness just to go through the process, you know, go down the line; however, we knew that based off of that representation, that they would not meet those requirements.

Q Now the next paragraph down from this, I that not sure if this comes from you or someone that read the Ordinance so maybe you can tell me.

The next paragraph says, "It is not clear when that would officially happen. Under the City's regulations, the person who got the Certificate of Compliance has a year to move forward with the project or withdraw their Certificate."

Did I read that correctly?

A You did.

Q And is that something you were talking to the Mountain Press about, or was that something they read, or do you know?

A No, that wouldn't have come from me. I am assuming that they would have just inferred that from looking at the Ordinances and Resolutions.

Q All right. So I think I can't go much deeper into what happens in the future because we are restricted to talking about this particular article, but I do want to follow up on one thing.

And that is, you had said earlier that part of the things that you submitted in that original applicant portal was the financial documents that qualified. So I am assuming when you made this statement, whatever financial documents that Jessica was supposed to submit has already been in there for her application to be complete; is that right?

A At the time I made this statement the application had not been reviewed.

Q Okay. I understand. Now what do you mean by reviewed?

A That per the process of this, that if the first drawn, you know, we -- you know, the way the lottery process worked, if the first person drawn, who received and won the lottery, if their application met all requirements, we wouldn't therefore not proceed with a review of any other applications in that zone.

Q I understand. Did you ever review the remaining applications?

A Once this all became public and became, you know, where we are at now, we did go back and look and see if the necessary requirements would have been met.

Q When you say, "this," "once this had

happened" --

A Once the publicity over the challenge from Ms. Strode became public, we, at that point in time -- and there were additional public requests, et cetera that came into that -- we did go and look at the application at that point in time.

Q Okay. So when you say, "Once this happened," you mean once Jessica Strode filed her lawsuit, that you then put her application through the same review process that you gave to Cars LLC?

A It might not necessarily have been the same review process, but we did go in and look at what other requirements would have been met.

Q Okay. So whether it was the same process or a different process, tell me what documents you reviewed, if you remember, from Jessica Strode that led you to eventually say the financial circumstances would not have been adequate for her?

MR. BATSON: Object to the form of the question. You may answer it.

Q No, don't answer that. I didn't ask it very well. Did you come to a conclusion regarding whether or not Jessica Strode would be a qualified financial applicant?

A Yes. That actual, you know, in going in

and looking at the application, it was determined that there were several documents that would have been necessary to be submitted by a required date and deadline that were not submitted.

Q Okay. So the reason for this review was because litigation had been filed; is that right?

A Correct.

Q Now do you remember what the missing documents were?

A Not specifically, but I believe it has been -- those missing requirements had been detailed in one of the filings.

Q Was Ms. Strode ever informed of the fact that she was missing any documents?

A No, none of the additional applicants were formally informed of anything because we did not go through a formal review or a formal disqualification process because there was no need to.

Q I understand. Can you tell me, as you sit here today, what documents you believe were missing?

A I don't believe a photo ID was uploaded. There were missing financial documents. Proof of ownership had not been submitted. That is the ones that I specifically remember off of the top of my head.

Q Okay. So no photo identification for Ms. Strode, and no proof of ownership?

A Proof of ownership or financial documentation.

Q Okay. So let me ask you this: You had mentioned that the portal was designed and you had some hand with working with someone to design the portal, and you are telling me that all of these documents that you are referencing were required at the front end to be put through the portal; is that right?

A Yes. There were two dates that were because of the length of time that we understood that it would take to pull some of the financial documents together, there was a separate later date of a deadline that they were required to be submitted by. So there was an initial date that certain documents were required to be submitted by and there was a secondary date that the others were required to be submitted by.

Q I got you. Now was there a selection of an applicant between those two dates?

A The lottery would have commenced in between those two dates, but the -- yes.

Q So the lottery -- was the result of the

lottery known after the initial date but before the second date?

A Correct.

Q So in other words, by the time the requirement to submit the financials had rolled around, there had already been a selection of a winning applicant; is that right?

A The lottery process would have commenced, yes, would have been held, yes.

Q Lottery had been held?

A Yes.

Q Winner had been announced. And then there was a second date for financials after that?

A Correct.

Q All right. I think I understand. Was this portal used for anything besides the applications, or was it closed once the applications were finished?

Q Well, it is like an all encompassing application process that we use for various different City submittals, but we had a specific, you know, the part of it used for this was specific to the retail package stores.

Q Okay. So the part that was used for the lottery specific to the retail stores was open for a

time, and I am assuming that it then closed?
A That is correct.
Q And when was it closed?
A Well, I mean, so if you -- the ability to submit an application was closed at the deadline of being able to receive applications. I don't remember that specific date we are talking about. I believe it was December-something, but any applicant who had submitted an application still had access through their login to, you know, add, or remove or, you know, modify their specific application. So even though you could not submit a new application, you still had the ability to upload documents to your own application.
Q I understand. So does that ability still exist for Ms. Strode, or has that ability now been closed?
A No, I believe that she could still -- the ability to go into her application, documents review, status, et cetera is still available, but everything is, you know, timestamped and audited, et cetera.
Q All right. I appreciate that. I am getting pretty close to what I can get out of this article that we have talked about. Let me just look

at my notes for a second and see if I left anything out, and then, of course, Mr. Batson has a right to ask you any questions if he chooses to.

So, let's see. I guess there are a couple of follow ups I do have about what you have told me already today. One is, you had mentioned that somebody helped you with putting this portal together. Can you tell me who that was?

A It would have just been the development team for the website or for that portal, so it would have been that software company.

Q And do you remember who that software company was?

A It is MyGovernmentOnline.

Q MyGovernmentOnline. Is that the name of a company?

A Yes, um-hmm.

Q Very descriptive name. All right. So out of fairness to my client, and I apologize for the disjointedness of this, but I do need to step outside and just make sure I haven't forgotten to ask something that needed to be asked. Then after that, I will turn it over to Mr. Batson. Okay. I'm going to the step outside.

(Brief recess.)

Q The good news, Mr. Smith, is I have no further questions for you at this time.
A Okay.

CROSS EXAMINATION

BY MR. BATSON:

Q I only had one thing and up will show you this. I am going to ask you to take a look at that document and see if you know what that is. It has been filed with the Court as an exhibit. And it has got an exhibit sticker "B", which was to the original Answer to the Original Complaint. That is why it has got the document number.
A Yes. This would have been part of that initial set up that we had talked about earlier regarding setting up the website page that discusses the portal and all of the requirements.
Q So it outlines the Retail Package Store Online Application Process, and then the Retail Package Store Certificate of Compliance Application. It was all in one -- all on the portal?
A Can you say that again?
Q This is a four-page document that has been marked as Exhibit B to the Answer, original Answer, but it is captioned on the first page, "Retail Package Store Online Application Process," and

"Retail Package Store Certificate of Compliance Application." All this was available on the portal, on the website?

A On the website, yes.

Q On the portal?

A Yes.

Q That is all that I have, thank you.

MR. BATSON: I am going to mark this Exhibit 3.

(The Retail Package Store Online Application Process and Retail Package Store Certificate of Compliance Application were marked Exhibit No. 3 and attached.)

REDIRECT EXAMINATION

BY MR. CROSKERY:

Q I do have a follow up on that. In the third page of this exhibit, Exhibit 3, and you will notice that this third page is a copy of what appears to be a website from the City of Sevierville. Is that what that is, a duplicate of your website?

A Yes.

Q All right. It says, "The application period has closed and will not be reopened at this time."

Now, of course, that could have been far earlier than this, but this was filed on February 6th of 2026. Is it your understanding that even though the application has closed and will not be reopened at this time, that that does not apply to somebody who already has an extant application?

A Correct. They can still get into the system.

Q All right. And if they were not able to get into the system but they had already opened up an application, if your assumption that they could get into the portal was wrong, then what would their recourse be? Would they be able to submit the documents directly?

MR. BATSON: Object to the form of the question. You may answer.

A What we would have had them do is, I mean, it would have been a technical difficulty or something like that, so we would have asked them to contact -- first and foremost contact the MyGovernmentOnline group to ask them why they were not able to get access to that. However, I can't say this for sure, but the assumption would be if they were having an issue getting in there, that

they would have reached out to us and we could have accepted the documents through email and uploaded them ourselves prior to the deadline.

Q Okay. I understand. Now were there any problems with MyGovernmentOnline and its website that you are aware of?

A Not that I was aware of. No one else had reported any issues.

Q And I am going a little broader than just this particular application. Had there been problems with MyGovernmentOnline with the City of Sevierville?

A No, not --

Q That you know of?

A Not from the customer facing side, no.

Q I appreciate it. That was my only follow up.

MR. BATSON: That is it.

MR. CROSKERY: That you very much for coming in today. As we stated, this deposition will be continued in progress so that we can go into the rest of it after Cars LLC has a chance to get involved. Thank you so much for coming in.

FURTHER THIS DEPONENT SAITH NOT.

CERTIFICATE

COUNTY OF KNOX )
STATE OF TENNESSEE )
.

I, Verna Mansfield, LCR #1001, Licensed Court Reporter, do hereby certify that I reported by stenographic means the foregoing excerpted pages numbered 1 to 50, and that the transcript is a true and accurate record to the best of my knowledge, skill, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this action.

Witness my hand this 16th day of September, 2026.

Verna Mansfield

Verna Mansfield, LCR 1001
Licensed Court Reporter
LCR License Expires: 06/30/27